[No. A119615. First Dist., Div. Five. Sept. 9, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
JASON QUILES, Defendant and Appellant.

**[CERTIFIED FOR PARTIAL PUBLICATION*]**

---

*Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of part II.B., C., and D.

COUNSEL

Paul Kleven, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Seth K. Schalit and Catherine McBrien, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**NEEDHAM, J.**—Jason Quiles appeals from a judgment of conviction and sentence imposed after a jury convicted him of multiple crimes. He contends

(1) his constitutional rights were violated when the court imposed the upper term of sentence based on his prior juvenile adjudications; (2) testimony that Quiles told a nurse he was going to "have one of the witnesses smacked" improperly tainted the case against him; (3) his defense attorney provided ineffective assistance of counsel by failing to object to the prosecutor's closing argument; and (4) the court should have severed a grand theft charge from his more serious charges.

In the published portion of our opinion, we conclude that the trial court did not err in imposing the upper term of sentence. Prior juvenile adjudications may be used in imposing the upper term under California Rules of Court, rule 4.421(b)(2). In evaluating whether juvenile adjudications are of increasing seriousness, the court may consider the elements of the respective offenses. In the unpublished portion of our opinion, we conclude that the remainder of Quiles's contentions lack merit. We will affirm the judgment.

## I. FACTS AND PROCEDURAL HISTORY

A second amended information charged Quiles as follows: count one, grand theft (Pen. Code, § 487, subd. (c)) on October 8, 2005; counts two, three, four, and nine, second degree robbery (Pen. Code, § 212.5) on October 18, 2005; counts six and eleven, assault with a firearm (Pen. Code, § 245, subd. (a)(2)) on October 18, 2005; count seven, attempted robbery (Pen. Code, §§ 212.5, 664) on October 18, 2005; and counts twelve and thirteen, second degree robbery (Pen. Code, § 212.5) on October 14, 2005.[1] Additional counts for attempted murder (§§ 187, 664) and dissuading a witness (§ 136.1, subd. (c)(1)) were dismissed under section 995.

The second amended information further alleged that the robberies were serious offenses (§ 1192.7, subd. (c)(19)), Quiles was armed with a firearm during five of the robberies (§ 12022, subd. (a)(1)), and he personally used a firearm (§ 12022.53, subd. (b)) during the commission of count four and count twelve.

The trial court denied Quiles's motion to sever the charges. The matter proceeded to a trial by jury.

### A. *Evidence at Trial*

#### 1. *Grand Theft of Sundin (Count One)*

Around 3:30 p.m. on October 8, 2005, Kelly Sundin was in a coffee shop working on her laptop computer. A young African-American man (Quiles)

---

[1] Except where otherwise indicated, all statutory references are to the Penal Code.

"swooped in and grabbed" the laptop from her hands. Sundin reached out to grab the laptop back, but Quiles ran out of the coffee shop with the computer. Sundin ran after Quiles but was unable to catch him.

Jeremy Tooker, the owner of the coffee shop, saw the "tussle" between Sundin and Quiles over the laptop. After Quiles ran out the door, Tooker chased him for two blocks and saw him get into a white hatchback car, with an African-American woman in the driver's seat. Tooker told Quiles to "give it up" because he had memorized the car's license plate. Quiles responded "so what" and instructed the driver to leave. A car had stopped on the street, blocking Quiles's vehicle from leaving the parking place; the driver of Quiles's car drove onto the sidewalk for about half a block before returning to the street and speeding away.

Inspector Steve Mulkeen investigated the theft and issued a teletype with a description of the getaway car and its license plate. About 10 days after the crime, he learned the getaway car had been towed. Quiles's interim driver's license was found inside the car.

Tooker identified Quiles in a photographic lineup, at the preliminary hearing, and at trial.

### 2. Robbery of Hyde and Casillas (Counts Two and Three)

Around 4:15 p.m. on October 18, 2005, Alexander Hyde and Diego Casillas were walking on Haight Street planning to take pictures for a photography class. A white car pulled up and screeched to a halt. Quiles got out of the car and walked toward Casillas. Getting so close to Casillas that their foreheads touched, Quiles yelled profanities at Casillas and took his camera.

At Quiles's prompting, the driver of Quiles's vehicle displayed the grip of a black, automatic handgun in his pocket. Quiles grabbed Hyde's camera and pushed him, saying, "Give me some money." Hyde claimed he did not have any and gave Quiles his wallet, which contained no money. Quiles pushed him again and said, "Where is the money?"

Quiles eventually returned to the car and told the driver that Hyde and Casillas had seen the car's license plate. Quiles approached Hyde again, took

the driver's license from Hyde's wallet, and told Hyde that if he went to the police, "someone would come to [his] house." Quiles then got in the car and left, and Hyde telephoned the police.

Later that afternoon, the police took Hyde and Casillas to a location where a white Chevy Caprice had crashed. The car was registered to Quiles. Casillas and Hyde identified the car as the one used in the robbery and saw their cameras on the car's floorboard. The car contained an insurance payment coupon and insurance identification card in Quiles's name, as well as Hyde's driver's license.

Hyde and Casillas identified Quiles in a photographic lineup and in court.

### 3. *Robbery of Rabahat and Reynoca (Counts Four, Six, Seven, Nine and Eleven)*

Around 4:25 p.m. on October 18, 2005—about 10 minutes after the robbery of Hyde and Casillas—Nael Rabahat observed two African-American males enter his store. One of the men (purportedly Quiles) held a gun about two inches from Rabahat's head and said, "Give us all the money." The robbers emptied the cash register of approximately $1,400–$1,500. While Quiles held Rabahat at gunpoint, his accomplice went to the back of the store and filled a green garbage can with about 30 cartons of cigarettes. When the accomplice returned with the cigarettes, he said, "I'm done. Shoot the son of a bitch." The gun Quiles was pointing at Rabahat's head then made a "ticking sound." Terrified, Rabahat pushed Quiles away and ran out of the store. Quiles and his accomplice fled.

After viewing a video lineup, Rabahat was 100 percent sure Quiles was one of the two robbers and about 75 percent sure Quiles was the man who had the gun. Rabahat also identified Quiles in court. In addition, Rabahat identified a trash can full of cartons of cigarettes that were found in Quiles's car.

Mark Brown testified that he pulled up to the store and saw Rabahat run outside, screaming, "Call the police. Dial 911." Brown dialed 911 as he was parking his car. Suddenly an African-American man "threw himself" into the passenger side of his car and tried to grab Brown's phone. The man also knocked Brown's glasses off and "went for" Brown's car keys. Brown managed to hang on to his cell phone and drove away without his glasses.

Marlon Reynoca had parked his oxygen delivery truck nearby around 4:30 p.m. While he was at his truck, he was accosted by Quiles, who ordered him to hand over his money. Reynoca handed Quiles $40. Reynoca then saw

Quiles take a telephone from Reynoca's customer and throw it toward a Caucasian man. The Caucasian man tackled Quiles, and they briefly fought on the ground. About a month after the incident, Reynoca identified Quiles in a video lineup as his assailant; he was unable to identify the assailant at trial.

Cathy Choy, Reynoca's oxygen delivery customer, looked out her window and saw Quiles and Reynoca. Choy grabbed her cordless telephone and went to her doorway to see what was happening. As Choy emerged from her home, Quiles grabbed the phone away from her. Choy went back inside and slammed the door shut. Choy then heard two gunshots. Choy identified Quiles in a video lineup as the man who grabbed her phone, but she did not recognize anyone in the courtroom at trial.

Choy's neighbor, Christie Davis, saw Quiles running past her house, pursued by a Caucasian man. The Caucasian man tackled Quiles, and the two briefly struggled on the ground. Another African-American man, who had been stuffing a trash can into a car, pulled out a gun. The Caucasian man ran back in the direction from which he had come, and then the African-American man shot at him. Both African-American men sped away in the car. Davis could not identify anyone in the courtroom at trial.

Pete Blanco, the man who tackled Quiles, was sitting in his truck in front of Rabahat's store around 4:30 p.m. when he saw two African-American men run out of it. Rabahat ran out and yelled to call 911; he also confirmed to Blanco that he was being robbed. One of the African-American men, carrying a green garbage can filled with store products, dropped the can and tried to jump through the window of a red car parked across the street, but was thrown out of it. The other African-American man (Quiles) was dressed all in black; Blanco chased after him. The man threw something at Blanco, hitting his thigh and leaving a large bruise shaped like a cell phone. Blanco tackled Quiles and "pinned him to the ground." Blanco looked up and saw another African-American man running toward him with a gun. Blanco jumped off of Quiles and began running away. Blanco heard Quiles yell repeatedly, "Shoot the mother fucker." Blanco heard two gunshots. After briefly taking cover, Blanco saw Quiles jump into a white Chevy Caprice and take off. Blanco jumped in his truck, "spun it around," and gave chase. Quiles's car struck parked cars, became temporarily stuck under a truck it had hit, and took off again. Blanco followed a trail of fluids leaking from Quiles's car and eventually found it abandoned in a cul-de-sac.

Rabahat's stolen cigarettes were located inside the wrecked car. Quiles's fingerprints were found on eight of the cigarette cartons. Police located two nine-millimeter shell casings on the street near the robbery scene, as well as 67 rounds of the same ammunition inside Quiles's car.

### 4. *Threat to Have Witness "Smacked"*

On July 20, 2007, Crystal Murphy was working as a nursing assistant at San Francisco General Hospital. Murphy was assigned to monitor Quiles, who was in a locked facility inside the hospital for a tooth extraction. Quiles told Murphy that he was in prison for a serious crime. Quiles further stated, in Murphy's words, that "he was going to be getting out soon, and his partner was—he was going to have one of the witnesses smacked, and his partner was waiting on him—I mean working on him." Later that night, Murphy told the sheriff about the conversation.

### B. *Jury Verdict and Sentence*

The jury found Quiles guilty of grand theft, four counts of second degree robbery, and two counts of assault with a firearm. Quiles was acquitted of the two robberies allegedly committed on October 14, 2005 (counts twelve and thirteen), and the jury found the personal use of a firearm allegation not true. (The prosecution had dismissed count seven, attempted robbery, during trial.)

The court sentenced Quiles to an aggregate term of 12 years four months, consisting of the upper term of five years on count two of second degree robbery; consecutive sentences of one-third the middle term on each additional count; plus enhancements for being armed with a firearm (§ 12022, subd. (a)(1)). The upper term on count two was imposed on the ground that Quiles's two prior sustained juvenile petitions were numerous or increasing in seriousness.

This appeal followed.

## II. DISCUSSION

As mentioned, Quiles contends (1) imposition of the upper term of sentence based on his prior juvenile adjudications was unconstitutional; (2) Murphy's testimony about Quiles having a witness "smacked" was inadmissible; (3) defense counsel provided ineffective assistance of counsel; and (4) the court should have severed the count one grand theft charge from the other charges. We consider each in turn.

### A. *Imposition of the Upper Term of Sentence*

Under rule 4.421(b)(2) of the California Rules of Court, an upper term of sentence may be imposed where "[t]he defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness." (See *In re Christopher B.* (2007) 156

Cal.App.4th 1557, 1564 [68 Cal.Rptr.3d 253].) The trial court imposed the upper term of five years on the second degree robbery charge based on Quiles's "prior sustained petitions for burglary and robbery" incurred as a juvenile.

### 1. Use of Juvenile Adjudications Under California Rules of Court, Rule 4.421(b)(2)

■ Quiles contends the court's use of his prior juvenile adjudications to impose the upper term under California Rules of Court, rule 4.421(b)(2) was unconstitutional. Because juvenile adjudications lack the procedural protections of adult convictions such as the right to a jury trial, Quiles urges that they do not fall within the recidivism exception to the requirement that the upper term be based on facts found by a jury to be true beyond a reasonable doubt. (See, e.g., *Apprendi v. New Jersey* (2000) 530 U.S. 466, 490 [147 L.Ed.2d 435, 120 S.Ct. 2348] (*Apprendi*); *Cunningham v. California* (2007) 549 U.S. 270, 274–275 [166 L.Ed.2d 856, 127 S.Ct. 856] (*Cunningham*).)

■ The constitutionality of using prior juvenile adjudications to enhance an adult offender's sentence was recently decided by our Supreme Court in *People v. Nguyên* (2009) 46 Cal.4th 1007 [95 Cal.Rptr.3d 615, 209 P.3d 946]. At issue in *Nguyen* was whether a prior juvenile adjudication could be used to increase an adult felony offender's maximum sentence under California's "Three Strikes" law (§§ 667, subd. (d)(3), 1170.12, subd. (b)(3)). (*Nguyen*, at p. 1010.) The court explained that *Apprendi* and its progeny (including *Cunningham*) held that a defendant has a constitutional right to a jury finding beyond a reasonable doubt on any fact used to impose an aggravated sentence for a felony. (*Ibid.*) *Apprendi* recognized an exception for the fact of a prior conviction, since recidivism is a traditional basis for increasing a sentence and, unlike an element of an offense, recidivism relates not to the current offense but solely to punishment. (*Id.* at p. 1011.) The defendant in *Nguyen* claimed that *Apprendi*'s recidivism exception did not apply to prior juvenile adjudications because juvenile proceedings do not afford the right to a jury trial. (*Ibid.*) Our Supreme Court in *Nguyen* held: "[T]he absence of a constitutional or statutory right to jury trial under the juvenile law does not, under *Apprendi*, preclude the use of a prior juvenile adjudication of criminal misconduct to enhance the maximum sentence for a subsequent adult felony offense by the same person." (*Id.* at p. 1028.)

Although *Nguyen* did not involve the use of prior juvenile adjudications to establish an aggravating factor under rule 4.421(b)(2) of the California Rules of Court, it clearly held that there was no constitutional barrier to using prior juvenile adjudications, like prior adult convictions, to increase the term of sentence under the recidivism exception without the need for a jury to find

the prior adjudications beyond a reasonable doubt. *Nguyen* is therefore dispositive of the issue before us.[2]

### 2. Numerosity or Increasing Seriousness

Quiles further argues that, even if juvenile adjudications could be used to impose the upper term sentence, his two prior sustained petitions were insufficient to support the upper term in this case, because they were not numerous or of increasing seriousness. (Cal. Rules of Court, rule 4.421(b)(2).)

According to the probation report, Quiles suffered a sustained juvenile petition for burglary in December 1999 and a sustained juvenile petition for second degree robbery in April 2002. Quiles argues, and respondent does not dispute, that two prior adjudications are not "numerous" within the meaning of California Rules of Court, rule 4.421(b)(2).

■ It was reasonable for the trial court to conclude, however, that Quiles's prior juvenile adjudications were of increasing seriousness. Burglary does not require proof of force, fear, or violence. (§ 459.) Robbery, however, involves taking personal property with "force or fear." (§ 211.) In addition, robbery is classified as both a serious felony (§ 1192.7, subd. (c)(19)) *and* a violent felony (§ 667.5, subd. (c)(9)), while second degree burglary is neither, and even first degree burglary is not a violent felony without further proof (§ 667.5, subd. (c)(21)). Since robbery is by definition more serious than burglary, and Quiles's robbery occurred after his burglary, it is apparent from the face of the record that Quiles's prior juvenile adjudications were of increasing seriousness.

Quiles argues that the relative seriousness of prior offenses must be gauged only by the range of sentence that could have been imposed for each offense. (See *People v. Black* (2007) 41 Cal.4th 799, 820 [62 Cal.Rptr.3d 569, 161 P.3d 1130] (*Black*) [court may determine relative seriousness of the offenses by "reference to the range of punishment provided by statute for each offense"].) In this case, he maintains, his 1999 burglary adjudication could have been for first

---

[2] The parties to this appeal filed their appellate briefs before our Supreme Court issued its decision in *Nguyen*. Quiles relied on *U.S. v. Tighe* (9th Cir. 2001) 266 F.3d 1187, which ruled: "Juvenile adjudications that do not afford the right to a jury trial and a beyond-a-reasonable-doubt burden of proof, therefore, do not fall within *Apprendi's* 'prior conviction' exception." (*Id.* at p. 1194.) *Tighe* has not been well received. Indeed, the Ninth Circuit in *Boyd v. Newland* (9th Cir. 2004) 393 F.3d 1008, noted the authority contrary to *Tighe* in California and other federal circuits, and concluded: "we cannot hold that the California courts' use of Petitioner's juvenile adjudication as a sentencing enhancement was contrary to, or involved an unreasonable application of, Supreme Court precedent." (*Id.* at p. 1017.) In any event, our Supreme Court's decision in *Nguyen* now governs the matter.

degree burglary or second degree burglary. If it was for first degree burglary, the upper range of sentence would have been six years (§ 461), which would be more than the upper range of sentence for his subsequent second degree robbery (five years under § 213, subd. (a)(2)). Under this theory, Quiles's juvenile offenses would be of *de*creasing seriousness. Because it was unclear from the record whether the 1999 burglary was in the first or second degree, Quiles urges, the trial court did not have a sufficient basis for concluding his prior juvenile adjudications were of increasing seriousness.

■ We disagree. The court in *Black* did not *require* trial courts to determine the relative seriousness of prior offenses solely by their respective range of sentence. The court stated: "The determinations whether a defendant has suffered prior convictions, and whether those convictions are 'numerous or of increasing seriousness' (Cal. Rules of Court, rule 4.421(b)(2)), require consideration of only the number, dates, and offenses of the prior convictions alleged. The relative seriousness of these alleged convictions *may* be determined simply by reference to the range of punishment provided by statute for each offense. This type of determination is 'quite different from the resolution of the issues submitted to a jury, and is one more typically and appropriately undertaken by a court.' [Citation.]" (*Black, supra,* 41 Cal.4th at pp. 819–820, italics added.) The fact that the relative seriousness of offenses "*may* be determined simply by reference to the range of punishment provided by statute" does not mean the trial court must close its eyes to the statutory definition of the offenses themselves. To the contrary, the trial court is required to consider the "number, dates, and *offenses*" constituting the alleged priors. (*Id.* at p. 820, italics added.) ■ Nothing in *Black* precludes the trial court from evaluating the relative seriousness of prior offenses from aspects of the record other than the respective ranges of punishment—such as the elements of those offenses—particularly where the range of punishment for the offenses was not clarified by the parties in the trial court. Like a comparison of the offenses' respective punishments, a comparison of the offenses' respective elements is the "type of determination . . . 'more typically and appropriately undertaken by a court.' " (*Black,* at p. 820.)

Quiles fails to establish error in the court's imposition of the upper term of sentence.

B.–D.*

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

*See footnote, *ante,* page 612.

### III. Disposition

The judgment is affirmed.

Simons, Acting P. J., and Bruiniers, J., concurred.

Appellant's petition for review by the Supreme Court was denied December 17, 2009, S177223.