Filed 3/21/23 P. v. Higgins CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>CHARLES CARL HIGGINS,<br><br>Defendant and Appellant. | F083080<br><br>(Super. Ct. No. PCF378161)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Tulare County. Stephen Drew, Judge.*

John Steinberg under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Brook A. Bennigson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

*Retired Judge of the Tulare Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

A jury found Charles Carl Higgins (defendant) guilty of raping, and committing additional offenses against, a 14-year-old victim. Defendant was 43 years old when the underlying incident occurred. He was sentenced to a total of 13 years 2 months in prison, which included the upper term of 11 years for the rape conviction.

Defendant seeks reversal based on the admission of certain evidence at trial and alleged instructional error. In the alternative, he challenges multiple aspects of his sentence. The claims of trial error lack merit. Defendant does, however, make valid arguments based on Senate Bill No. 567 (2021–2022 Reg. Sess.) (Senate Bill 567), which changed the law governing the imposition of upper term sentencing. We affirm the convictions but remand the cause for a new sentencing hearing.

## FACTUAL AND PROCEDURAL BACKGROUND[1]

Defendant was a longtime cohabitant and romantic partner of the victim's mother. The victim considered him to be her "step-dad." On March 23, 2019, the victim reported to family members and law enforcement that defendant had sexually assaulted her earlier in the day.

According to a sheriff's deputy who took her initial statements, the victim "said that she was at her mom's house with [defendant] and that she needed some money for some beauty products and to get money he gave her a list of chores, something she could choose to get money[,] and one was a massage." The victim elected to perform the massage, which involved the use of magnets. "She said she gave him a massage for a

---

[1] The reporter's transcript contains several abbreviations that were never explained by the witnesses who used them. On our own motion, we take judicial notice that "DNA" is an initialism for deoxyribonucleic acid. (Evid. Code, § 452, subds. (g), (h).) The acronym "CART" is an abbreviation of "Child Abuse Response Team." (E.g., <https://forthechild.org/the-child-abuse-response-team-cart/> [as of Mar. 21, 2023].) A similar acronym, "SART," stands for "Sexual Assault Response Team." (*People v. Uribe* (2008) 162 Cal.App.4th 1457, 1463; <https://www.rainn.org/articles/what-sanesart> [as of Mar. 21, 2023] ["The Sexual Assault Response Team (SART) is a community-based team that coordinates the response to victims of sexual assault"].) We note, however, that a SART nurse in this case testified to her understanding that "SART stands for … Suspected Sexual Abuse Response Team."

2.

little while, maybe like ten minutes and then he offered to give her a massage and she agreed. [¶] And she said while getting a massage she fell asleep and then she woke up to his fingers in her vagina." Next, as told to the deputy, defendant took off his pants, removed the victim's shorts, and "put his dick in her." The victim reacted by pushing him away, running to a bathroom, and locking herself inside.

After speaking to the deputy, the victim was briefly questioned by a detective. She repeated the same basic allegations. The victim was noted to be "quiet" and "withdrawn," and gave only "limited answers" to the detective's questions.

The detective arranged for the victim to undergo a SART examination that evening. After making those arrangements, he interrogated defendant. Defendant was handcuffed and shackled during the custodial interview, which lasted approximately two hours. Having been arrested after coming out of the shower, he was also barefoot.

Defendant confirmed he had made a list of things the victim could do to earn money. He disputed the term "massage," explaining how the task she chose involved rubbing magnets over parts of his back and shoulder. The "magnet thing" had taken place on the floor of the victim's bedroom in the middle of the day, and a six-year-old relative was napping in the bed while it occurred. Defendant admitted to rubbing magnets over the victim's back, but he repeatedly denied any wrongdoing.

The detective told defendant the victim's boyfriend had already corroborated her story about locking herself in a bathroom after the assault. The detective alleged the victim and her boyfriend were videoconferencing over "FaceTime" while she was in the bathroom, and both had reported that defendant knocked on the door and said something to the effect of, "'Hey, let's talk about what happened.'"

Defendant said the bathroom allegation was partially true. In a vague and disjointed explanation, he alluded to the victim having confided in him that she and the boyfriend were sexually active. Defendant had previously told the detective the victim "said she's had sex twice with him," i.e., with her boyfriend. Defendant further alleged

3.

the victim had shown him a cartoonish video on her phone of a male and female "humping." When asked if the victim "came on to [him] in any kind of way," he answered "No."

Other parts of the interview focused on the possible existence of DNA evidence. The detective first asked, "[W]ould there be any reason as to why we would find any of your DNA on her clothing, on her body?" Defendant replied, "Probably. There might have been." He then gave another vague and incomplete explanation based on having allegedly masturbated earlier in the day.

When told the victim was "claiming full on sex," defendant insisted there would be no corroborative DNA evidence. This line of questioning included the following exchange:

> "[DETECTIVE]: [M]y partner took [the victim] down to … the office, to the urgent care and that's where they're doing the exam, so what if I were to tell you that he called me to tell me that they did find some DNA inside of her that … didn't belong to her?
>
> "[DEFENDANT]: Would you be telling me the truth?
>
> "[DETECTIVE]: Yeah. That's—I stepped out and I took a phone call. Right? So I'm asking you that wouldn't be your DNA?
>
> "[DEFENDANT]: No.
>
> "[DETECTIVE]: But what if it was?
>
> "[DEFENDANT]: It wouldn't be.
>
> "[DETECTIVE]: But what if it was?
>
> "[DEFENDANT]: If it was?
>
> "[DETECTIVE]: Yeah.
>
> "[DEFENDANT]: Then I—
>
> "[DETECTIVE]: How did it get in there?
>
> "[DEFENDANT]: I'd be guilty then. But it isn't."

4.

The custodial interview ended with defendant maintaining his innocence.

During the victim's SART examination, the forensic examiner obtained verbal responses to standardized questions. According to the examiner (the "SART nurse"), the victim said defendant "took her clothes off and proceeded to have sex with her for about [five] minutes." The victim answered no to a series of questions regarding the "methods" used by the perpetrator, including "any grabbing, holding," or "physical hits." But she did make several new allegations, i.e., ones not previously documented by law enforcement. The victim claimed defendant had sucked on her breasts, "spit on her vagina," and made an unsuccessful attempt to sodomize her.

On physical examination, the SART nurse noted "redness … around [the victim's] cervix," a "small lesion" in the same area, and an unspecified amount of blood not attributable to menstruation. For purposes of DNA testing, swab samples were obtained from the victim's neck, breasts, stomach, vagina, cervix, anus, and inner thighs.

Six days later, on March 29, 2019, the victim participated in a recorded CART interview. Her statements notably conflicted with the account documented by the SART nurse in two ways. First, in contrast to the five-minute estimate previously given regarding sexual intercourse, the victim told the CART interviewer, "[H]e only put it in me once and I pushed him off." Second, whereas she had previously denied there was any "grabbing" or "holding," in the revised version she had tried running away after pushing defendant to the ground, but he grabbed her legs and a struggle ensued prior to the attempted sodomy. The victim confirmed that a six-year-old relative was asleep in the room when the incident occurred.

During the CART interview, the victim initially omitted the allegation of defendant placing his mouth on her breasts. When later asked about "any other places on your body where he touched you," she claimed defendant had groped, kissed, and licked her breasts prior to the attempted sodomy. She added that he also "grabbed my hand and

5.

[placed it on his penis]."  The forced touching of defendant's penis allegedly occurred "over his clothing."

Defendant was charged with forcible rape of a 14-year-old minor (Pen Code, § 261, subd. (a)(2); count 1); digital penetration of an unconscious person (§ 289, subd. (d); count 2); attempted forcible sodomy of a 14-year-old minor (§§ 286, subd. (c)(2)(C), 664; count 3); and six counts of committing lewd or lascivious acts upon a 14-year-old minor (§ 288, subd. (c)(1); counts 4 ["hand to vagina"], 5 ["penis to vagina"], 6 ["penis to buttocks"], 7 ["mouth to breast"], 8 ["hand to breast"] & 9 ["hand to penis"]).  The case was tried to a jury in early 2021.  (Undesignated statutory references are to the Penal Code.)

### Prosecution Case

The victim testified to a version of events similar to the account given in her recorded CART interview.  The recording was separately played for the jury.  There were some discrepancies and new allegations in the trial testimony, which the defense highlighted on cross-examination and during closing argument.

The victim's testimony clarified that the "massages" were a holistic medicine technique involving the use of small triangular magnets.  It did not entail any gripping or rubbing of the other person's body with the hands.  She acknowledged defendant had suffered a back injury and used the magnets as a form of treatment.

Additional prosecution witnesses included the victim's mother and father, her boyfriend at the time of the incident, the lead detective, the SART nurse, and a criminalist from the California Department of Justice Crime Laboratory.  The boyfriend confirmed that he and the victim had engaged in sexual intercourse a "couple times."  He testified the last time they had sex was approximately one month prior to the incident.

The criminalist testified to the results of DNA testing on certain swab samples obtained during the SART examination.  Law enforcement officials had elected not to test most of the swabs.  The analyzed specimens were referred to by their point of origin:

6.

"external vaginal," "vaginal," and "cervix." The cervix swab contained no sperm cells but did reveal a trace amount of male DNA from an unidentifiable source.

Sperm was found in the vaginal and external vaginal swab samples. The vaginal swab contained a partial male DNA profile that was positively matched to defendant. The external vaginal swab contained a DNA mixture that included "at least two male contributors," one of whom was defendant. The other male contributor was never identified.

### Defense Case

Defendant testified on his own behalf. In pertinent part, his testimony alleged the victim had "slid her legs underneath the bed all the way to her butt" before he applied the magnets. As he was rubbing the magnets over her back, she began to moan. Next, the victim suddenly and unexpectedly "slid both her legs out[,] turned sideways[,] and had her shorts off." With her "bare butt" facing him, the victim "reached for [his] waistband and got ahold of [his] penis." She then "pushed backwards against him," making contact with his now exposed but flaccid penis. The entire sequence happened within "a couple of seconds."

Defendant claimed to have rejected the victim's advances, pushing her away and saying, "'No. I can't. You got excited.'" He then "tried to tell her that things [were] going to be all right, and it was just her hormones acting up." The victim, appearing "embarrassed and scared," retreated to the bathroom. Defendant further testified to having masturbated a few hours prior to the incident, which supposedly explained the prosecution's DNA evidence.

On cross-examination, defendant was asked to reconcile how his DNA was found inside the victim's body if there was no sexual penetration. Despite maintaining that intercourse had not occurred, he conceded "the only way it could have got there is if she grabbed [my penis] and put it there." Defense counsel attempted to mitigate the arguably inconsistent testimony. On redirect examination, defendant again testified his penis was

7.

flaccid throughout the incident. He answered no when counsel asked if he had any "training regarding DNA or transfer of semen or sperm."

*Verdicts*

The jury deliberated for approximately 6.5 hours over the course of two days, including sitting through a readback of the victim's trial testimony. Shortly after beginning its deliberations, the jury asked, "Can the 14 year old consent to counts 1-3?" The trial court's response merely noted that lack of consent was an element of counts 1 and 3, and count 2 required an inability to resist due to unconsciousness, i.e., because the victim was asleep. After receiving this answer, the jury asked to review the victim's testimony. On the second day of deliberations, the jury asked, "What is the legal definition of consent regarding count 1 in reference to age and her mental ability?" In response, the trial court cited the following portions of CALCRIM No. 1000: "To *consent*, a woman must act freely and voluntarily and know the nature of the act" and "It is not required that she physically resist or fight back in order to communicate her lack of consent."

Defendant was found guilty as charged on counts 1, 3, 4, 5, and 6. He was found not guilty on counts 2, 7, and 8. The jury deadlocked on count 9, which was later dismissed. Sentencing details are provided elsewhere in the opinion.

## DISCUSSION

### I. Alleged Evidentiary Errors

Defendant alleges the trial court erred by (1) admitting evidence of a prior uncharged act under Evidence Code section 1108[2] and (2) overruling objections to certain testimony given by the SART nurse. The claims are meritless.

---

[2]"In a criminal action in which the defendant is accused of a sexual offense, evidence of the defendant's commission of another sexual offense or offenses is not made inadmissible by Section 1101, if the evidence is not inadmissible pursuant to Section 352." (Evid. Code, § 1108, subd. (a).)

## A.    Prior Uncharged Act

### 1.    *Background*

During her initial reporting of the rape, the victim alleged defendant had previously "touched her butt." Defendant was questioned about the accusation during his custodial interview. The detective began, "[S]he also told me about an incident that happened about a year ago. Um, she said she was lying in bed. She was asleep and she woke up to somebody—." Defendant interjected, "Turning off her light." The detective said, "[N]o, somebody touching her butt. So she continued to pretend she was asleep." Defendant replied, "I know exactly what you're talking about."

Defendant claimed the incident happened "more than a year ago" and involved an apparent misunderstanding. The victim had decorated her bedroom with "Christmas lights" and, on the night in question, fell asleep without turning them off. Defendant did not admit to touching her backside, but he purported to recall that she woke up when he went into the room to turn off the lights. He alleged his wife had "yelled at [him] the next day," asking, "'What the [expletive] [were] you doing in there?'"

The SART nurse made a note about the victim describing an "'incident with step-dad rubbing her butt over her clothes in 2017.'" The victim made the same allegation during her subsequent CART interview. On the latter occasion, she added that her mother also remembered the incident and had recently told her defendant was drunk when it happened.

Defendant moved in limine to exclude all evidence of the prior incident. Relying on Evidence Code section 352, he argued that admitting the evidence would lead to "a trial within a trial" on the truth of the allegation. The motion was denied based on Evidence Code section 1108.

The issue came up during the examinations of several witnesses at trial. The questioning was brief, and the testimony was generally consistent with the parties' previously documented statements. The victim's mother testified to having seen

9.

defendant coming out of the victim's room one night and asking both of them about it the next day. Defendant had allegedly said, "'Oh, I thought it was our room.'" The victim had allegedly said that "nothing happened."

Defendant testified as follows:

> "The only incident I remember that was anywhere similar to that was when I went in to unplug some Christmas lights. And she had—there was bunk beds and she had strung Christmas lights all the way around the top. They were plugged on the right side and on the left side with a little extension cord. [¶] And on that night I went back and I went to unplug them and she—I don't know if I leaned on the bed or whatever to reach across and she moved and scared the hell out of me and—but I had already unplugged it so then I took off."

### 2. Analysis

"Character evidence, sometimes described as evidence of a propensity or disposition to engage in a type of conduct, is generally inadmissible to prove a person's conduct on a specified occasion." (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1159.) This principle is codified in Evidence Code section 1101. An exception is found in Evidence Code section 1108. (*People v. Britt* (2002) 104 Cal.App.4th 500, 505.) "'In enacting Evidence Code section 1108, the Legislature decided evidence of uncharged sexual offenses is so uniquely probative in sex crimes prosecutions it is *presumed admissible* without regard to the limitations of Evidence Code section 1101.'" (*People v. Loy* (2011) 52 Cal.4th 46, 63, italics added.) The jury may consider such evidence "'*for any relevant purpose*' [citation], subject only to the prejudicial effect versus probative value weighing process required by [Evidence Code] section 352."[3] (*Britt, supra*, at p. 505.)

---

[3]Evidence Code section 352 provides: "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

10.

"In short, if evidence satisfies [Evidence Code] section 1108, and is not excluded under [Evidence Code] section 352, admission of that evidence to prove propensity is permitted." (*People v. Molano* (2019) 7 Cal.5th 620, 664.) "[T]he trial court's determination should be guided by such factors as the 'nature, relevance, and possible remoteness' of the evidence, 'the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission ….'" (*People v. Dworak* (2021) 11 Cal.5th 881, 900.)

The admission of evidence pursuant to Evidence Code section 1108 necessarily implies the balancing test of Evidence Code section 352 has been satisfied. (See Evid. Code, § 664; *People v. Carpenter* (1999) 21 Cal.4th 1016, 1053 ["a court need not expressly state for the record it engages in a weighing process every time it makes a ruling"].) "Like any ruling under [Evidence Code] section 352, the trial court's ruling admitting evidence under [Evidence Code] section 1108 is subject to review for abuse of discretion." (*People v. Story* (2009) 45 Cal.4th 1282, 1295; accord, *People v. Dworak*, *supra*, 11 Cal.5th at p. 899.) "Under the abuse of discretion standard, 'a trial court's ruling will not be disturbed, and reversal of the judgment is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice.'" (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.)

Defendant argues "the charged and uncharged acts involved no substantial similarities." He overlooks count 2, which was based on the victim's allegation of being digitally penetrated while asleep. Both the prior incident and the case before the jury involved allegations of defendant molesting the victim while she was sleeping. The evidence had propensity value in terms of showing defendant was sexually attracted to

11.

the underage victim and had previously acted upon those feelings. (See, e.g., *People v. Holford* (2012) 203 Cal.App.4th 155, 161, 185–186 [appellant's prior molestation of his 15-year-old daughter "tended to show [he had] a sexual attraction to young girls"].) The evidence was also probative of witness credibility since the victim's mother testified that while something outwardly suspicious had occurred, the victim initially said that "nothing happened."

Defendant also discusses the factors of remoteness, confusion of the issues, and "the danger of fabrication." The incident was estimated to have occurred within two years of the charged offenses, so the trial court was within its discretion to conclude remoteness was not a significant factor. (See, e.g., *People v. Merriman* (2014) 60 Cal.4th 1, 40–41 [incidents that occurred "no more than three years" apart held "not remote in time" for purposes of Evid. Code, § 1108].) Defendant argues "all of the evidence" regarding the prior incident came from the victim, but he is forgetting his own admissions during custodial interrogation. He also complains of "a 'mini-trial' to determine whether the uncharged act amounted to an innocent mistake," but the record does not support this argument. Moreover, the risk of undue consumption of time and juror confusion could have reasonably been assessed as low when the challenged ruling was made. Error has not been shown. (See generally *People v. Davis* (1996) 50 Cal.App.4th 168, 172 ["the appealing party must affirmatively demonstrate error on the face of the record"].)

### B. Expert Testimony

The SART nurse documented abnormal findings from her physical examination of the victim. In testifying to what was depicted in a photograph she had taken of the victim's cervix, she explained: "You can see there's areas of redness, kind of up at the top of her cervix. You can also notice the distinction between the redness and the pink color that a normal cervix—what a normal cervix looks like." The witness further

testified to her findings of a "small lesion" in the same area, i.e., "a small scrape, scratch, [or] laceration," as well as the presence of blood.

The cervical findings were said to be indicative of "[s]exual trauma or sexual intercourse," and "consistent" with the victim's allegations in the verbal portion of the exam. The SART nurse responded affirmatively when the prosecutor asked, "So that trauma was consistent with [the victim] reporting that she was just raped?" Defense counsel's objections to the testimony were overruled.

The SART nurse did not say the cervical findings were necessarily caused by or exclusively attributable to a sexual assault. On cross-examination, she conceded the injuries could have been sustained through "normal, consensual sexual intercourse." She also conceded her inability to provide "a specific timeframe as to when these injuries actually occurred." At one point defense counsel said, "[J]ust by looking at that photo you cannot say who caused that injury; correct?" The witness answered, "I can't say who, that's why I collect the DNA."

Defendant does not challenge the witness's qualifications as a SART nurse. He rather contends "an opinion that a particular injury is 'consistent' with a sexual assault" requires special "training or knowledge of expert studies on the genesis of such injuries." Defendant goes on to impliedly argue such experts do not exist because "[f]ew scientific studies purport to correlate certain physical injuries with the conclusion that they were inflicted by sexual assault." Therefore, "[a]bsent such studies, no witness should be allowed to testify that an injury is 'consistent' with sexual assault." Defendant presents his argument with virtually no supporting authority,[4] and we reject it for the following reasons.

[4]Defendant's briefing cites *Daubert v. Merrell Dow Pharmaceuticals, Inc.* (1993) 509 U.S. 579 for the general proposition that "in order to qualify as 'scientific knowledge,' an inference or assertion must be derived by the scientific method." (*Id.* at p. 590.) Defendant also quotes from *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113: "Where an expert bases his conclusion upon assumptions which are not supported by the record, upon

13.

"There is a statutory scheme addressing the function of SART exams in connection with the criminal investigative process. By legislative enactment, one hospital training center in the state was established for the purpose of, inter alia, 'train[ing] medical personnel on how to perform *medical evidentiary examinations* for victims of … sexual assault ….'" (*People v. Uribe*, *supra*, 162 Cal.App.4th at p. 1477, quoting § 13823.93, former subd. (b).)[5]  The SART nurse in this case was a licensed registered nurse with 15 years of experience as an emergency room nurse, had been trained as a forensic nurse examiner, and was qualified under the statutory scheme to "perform a medical evidentiary examination" of the victim, i.e., "to evaluate, collect, preserve, and document evidence, *interpret findings*, and document examination results as described in Sections 13823.5 to 13823.11, inclusive." (§ 13823.93, subd. (a), italics added; see generally *People v. Catlin* (2001) 26 Cal.4th 81, 131 ["Qualifications other than a license to practice medicine may serve to qualify a witness to give a medical opinion"].)

Furthermore, "a long line of California decisions … permit an expert medical witness to give an opinion of the cause of a particular injury on the basis of the expert's deduction from the appearance of the injury itself." (*People v. Bledsoe* (1984) 36 Cal.3d 236, 249; see *People v. Sanchez* (2016) 63 Cal.4th 665, 675.)  The SART nurse adequately testified to the basis for her opinions. She had knowledge of what a normal cervix looks like and articulated the abnormal findings from her physical examination of the victim. She explained "the cervix is really high up in the vagina, so unless there's something inserted into the vagina there is no other way those injuries can be there."

---

matters which are not reasonably relied upon by other experts, or upon factors which are speculative, remote or conjectural, then his conclusion has no evidentiary value." (*Id*. at p. 1135.)

[5]Section 13823.93, subdivision (b)(1), now uses the term "qualified healthcare professionals" instead of "medical personnel."

14.

Defendant complains the SART nurse had "no special knowledge regarding whether [the injuries were] inflicted during consensual sex rather than a forcible sexual assault," but the witness did not render such opinions. She testified the findings were "consistent" with the latter but did not necessarily rule out the former. Contrary to defendant's additional arguments, the testimony did not equate to vouching for the victim's credibility or expressing an opinion about defendant's guilt or innocence. Error has not been shown. (See *People v. Sta Ana* (2021) 73 Cal.App.5th 44, 57–59 [rejecting similar claim where a SART nurse "testified that [the complaining witness's] injuries were consistent with nonconsensual intercourse, based on a hypothetical that mirrored [the complainant's] testimony about how the alleged rape occurred. [¶] On cross-examination, the SART nurse acknowledged that injuries can occur during consensual sex …"]; cf. *People v. Rowland* (1992) 4 Cal.4th 238, 265–267 [rejecting challenge to "expert medical opinion that the absence of genital trauma is not inconsistent with nonconsensual sexual intercourse"].)

## II.    Alleged Instructional Error

In *People v. Mayberry* (1975) 15 Cal.3d 143 (*Mayberry*), the California Supreme Court "held that a defendant's reasonable and good faith mistake of fact regarding a person's consent to sexual intercourse is a defense to rape." (*People v. Williams* (1992) 4 Cal.4th 354, 360, citing *Mayberry*, *supra*, at p. 155.) The pattern instructions for sex crimes that require proof of nonconsensual acts have optional language explaining this principle. (E.g., CALCRIM Nos. 1000, 1030.) Although defendant did not request a *Mayberry* instruction, he contends the trial court had a sua sponte duty to give one for the charge of forcible rape as alleged in count 1. As we explain, the claim is untenable in light of his defense theory at trial.

"Ordinarily, consent of the victim is not a defense unless lack of consent is an element of the offense. [Citations.] Many sex crimes expressly include the element that

15.

the act was accomplished against the victim's will," including forcible rape within the meaning of section 261, subdivision (a)(2). (*People v. Oliver* (2020) 54 Cal.App.5th 1084, 1094.) The *Mayberry* holding provides for "a 'mistake of fact' defense, which requires evidence showing that the defendant perceived facts differently from how they actually existed. [Citation.] A *Mayberry* instruction 'should not be given absent substantial evidence of equivocal conduct that would have led a defendant to reasonably and in good faith believe consent existed where it did not." (*People v. Dillon* (2009) 174 Cal.App.4th 1367, 1381, italics omitted.)

"The court has a sua sponte duty to give a *Mayberry* instruction about good faith and reasonable belief in the victim's consent "'if it appears … the defendant is relying on such a defense, or if there is substantial evidence supportive of such a defense *and the defense is not inconsistent with the defendant's theory of the case*."' [Citations]." (*People v. Molano*, *supra*, 7 Cal.5th at pp. 667–668, italics added.) Defendant's claim fails because his defense at trial was the absence of any sexual behavior on his part. The People discuss this in their briefing, additionally noting that a *Mayberry* defense would have been tantamount to admitting guilt on counts 4 through 9. (See *People v. Soto* (2011) 51 Cal.4th 229, 245 ["Since 1981, the lewd act crimes in section 288 have been defined based on the offender's wrongful conduct only. The victim's 'consent,' such as it may be, is no longer material in these cases"].) Defendant's reply brief all but ignores the problem. He purports to "disagree" with the People and cites to *People v. Burnham* (1986) 176 Cal.App.3d 1134, which is plainly inapposite. (See *id*. at p. 1139 ["The theory of appellant's defense was that his wife was a voluntary participant in the various acts of sexual intercourse … and the act of penetration by a foreign object"].)

Defendant's trial counsel flat out accused the victim of being a liar. The attorney's opening statement argued, "We're here because [the victim] made a move on [defendant] and he turned her down. She was embarrassed and angry." In closing argument, counsel said, "[Defendant] turned her down and she was forced to lie to her

16.

friends and family about what happened." He concluded by saying, "[The victim] lied about what happened that day. No one wants to think a 14-year-old would lie about such a thing. It's terrible.… [¶] But at the end of the day, the DA has not met their burden. … [The victim] lied. And I ask that you find [defendant] not guilty."

Defendant denied having "any sort of sexual interest" in the victim. As reflected in the following trial testimony, he likewise denied all material allegations of sexual activity:

"Q. Did you ever at any point touch her breasts or vagina?

"A. No. She was on her stomach.

"Q. Did you ever touch—

"A. And her—she was underneath that bed all the way, so that's impossible.

"Q. Okay. At any point did you touch—did you ever penetrate her vagina with your finger?

"A. No.

"Q. Or your penis?

"A. No.

"Q. Have you ever had any sort of sexual contact—

"A. No.

"Q. —with [the victim]?

"A. (Shook head negatively)."

In all of the cases defendant purports to rely upon, the accused parties conceded their own willful involvement in the relevant sexual activity. (E.g., *People v. Andrews* (2015) 234 Cal.App.4th 590, 596; *People v. Sojka* (2011) 196 Cal.App.4th 733, 736; *People v. Burnham*, *supra*, 176 Cal.App.3d at pp. 1139, 1144; *People v. Rivera* (1984) 157 Cal.App.3d 736, 740.) Defendant not only denied any willing participation in the

alleged acts, he went so far as to claim, "She violated me." The only theory of consent pertained to the cervical findings, but the argument was those findings were easily attributable to consensual sex between the victim *and her boyfriend* (or whoever was the second male contributor to the DNA mixture found on the external vaginal swab sample). Because a *Mayberry* instruction would have been inconsistent with defendant's theory of the case, the trial court had no duty to provide one. (*People v. Molano*, *supra*, 7 Cal.5th at pp. 667–668; cf. *People v. May* (1989) 213 Cal.App.3d 118, 127 [*Mayberry* instruction required where appellant "never denied his active participation in the sexual conduct at issue, and substantial evidence produced by both sides supported an inference that he believed she was consenting"]; *People v. Burnham*, *supra*, 176 Cal.App.3d at p. 1144 ["Appellant never denied his active participation in the offenses; hence, mistake of fact was not inconsistent with his theory of defense, namely, consent"].)

## III.    Senate Bill 567

### A.    Additional Background

On July 9, 2021, defendant was sentenced to a total prison term of 13 years 2 months. The trial court imposed the upper term of 11 years for count 1 (§ 264, subd. (c)(2)) and one-third of the middle terms for counts 3 and 4 (translating to respective terms of 18 months and 8 months), all to be served consecutively. Concurrent upper term sentences were imposed for counts 5 and 6.

Defendant's sentence was in accord with the recommendations of the prosecutor and the probation department. The probation report identified five aggravating circumstances specified in the California Rules of Court (further rule references are to the California Rules of Court):

> "The crime involved great violence, great bodily harm, the threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness. (Rule 4.421(a)(1))

18.

"The victim was particularly vulnerable, as she was sleeping and youthful. (Rule 4.421(a)(3))

"The manner in which the crime was carried out indicates planning, sophistication, or professionalism. The defendant isolated the victim and provided an excuse to touch her by offering a massage. (Rule 4.421(a)((8))

"The defendant took advantage of a position of trust or confidence to commit the offense. (Rule 4.421(a)(11))

[and] [¶] … [¶]

"The defendant has engaged in violent conduct which indicates a serious danger to society. (Rule 4.421(b)(1))"

The People's statement in aggravation cited the same provisions and alleged many of the same factual circumstances. Also cited was rule 4.421(b)(2), which reads, "The defendant's prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness." The prosecutor alleged: "Defendant has a prior misdemeanor child abuse case for a violation of … section 273a(b) from 2006. The seriousness of his current convictions shows significant increase in seriousness and severity as an adult."

The trial court made these statements before pronouncing the judgment:

"The Court has read and considered probation officer's report and recommendations, the People's aggravation and the mitigation factors. The Court believes the probation report for the district attorney's office in this matter. The Court sat through the trial and never heard once that [defendant] was sorry. I believe during the course of your argument, [the prosecutor] stated that 16 times, in excess of ten times, [defendant] denied anything ever happening.

"The thing that struck the Court—that struck the Court, something happened because the sperm was found in her vagina. He denied everything, and at the trial one of his statements was—wasn't quite that far, but it was as close as you get by saying it was her fault. She's 14; he's 43. He's three times the age. He should know better. He should never put himself or her in the position that he did.

19.

"He violated the trust. He took care to plan this while the mother was not there, and those matter. [¶] The Court feels that the factors and [*sic*] aggravation outweigh any mitigation, and so the Court will proceed on that."

## B.    Applicable Law

At the time of sentencing, the decision to impose the lower, middle, or upper term for an offense with a sentencing triad rested "within the sound discretion" of the trial court based on its determination of what "best serves the interests of justice." (§ 1170, former subd. (b) as amended by Stats. 2020, ch. 29, § 14.)  Approximately three months later, in October 2021, Senate Bill 567 was signed into law. (Stats. 2021, ch. 731.)  As of January 1, 2022, trial courts are precluded from imposing the upper term unless such punishment is justified by "circumstances in aggravation of the crime …, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial…." (§ 1170, subd. (b)(2).)  However, "the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury…." (*Id*., subd. (b)(3).)

The parties contend Senate Bill 567 applies retroactively to judgments not yet final as of January 1, 2022.  "All published cases to consider this issue have found likewise." (*People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1109.)  We agree as well.  (See *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 303 [new legislation that "reduces the possible punishment for a class of persons" is presumptively retroactive].)

Defendant claims Senate Bill 567 entitles him to a new sentencing hearing.  The People argue remand is unnecessary.  To explain why we agree with defendant, it is necessary to first discuss a split of authority regarding the standard of review.

"'Failure to submit a sentencing factor to the jury, like failure to submit an element [of the crime] to the jury, is not structural error.'" (*People v. French* (2008) 43 Cal.4th 36, 52, quoting *Washington v. Recuenco* (2006) 548 U.S. 212, 222.)  "Such an

error does not require reversal if the reviewing court determines it was harmless beyond a reasonable doubt, applying the test set forth in *Chapman v. California* (1967) 386 U.S. 18." (*French*, at p. 52, citing *Neder v. United States* (1999) 527 U.S. 1, 15.) In this context, the test of *Chapman*, *supra*, 386 U.S. 18 (*Chapman*) requires a reviewing court "to determine 'whether, if the question of the existence of an aggravating circumstance or circumstances had been submitted to the jury, the jury's verdict would have authorized the upper term sentence.'" (*French*, at p. 53, quoting *People v. Sandoval* (2007) 41 Cal.4th 825, 838.)

In *People v. Flores* (2022) 75 Cal.App.5th 495 (*Flores*), Division Three of the First Appellate District articulated the following standard of review for errors arising from retroactive application of Senate Bill 567: "'[I]f a reviewing court concludes, beyond a reasonable doubt, that the jury, applying the beyond-a-reasonable-doubt standard, unquestionably would have found true at least a single aggravating circumstance had it been submitted to the jury,' the error is harmless." (*Id*. at p. 500, quoting *People v. Sandoval*, *supra*, 41 Cal.4th at p. 839.) Put differently, the *Chapman* test need not be applied in relation to all aggravating circumstances relied upon by the sentencing court. If one such circumstance would have undoubtedly been found to exist, "remand for resentencing … is unnecessary." (*Flores*, at p. 501.)

In *People v. Lopez* (2022) 78 Cal.App.5th 459 (*Lopez*), the Fourth Appellate District, Division One, disagreed with *Flores* and held that certainty under *Chapman* as to the existence of one among several factors relied upon by the sentencing court does not end the inquiry. According to *Lopez*, "the initial relevant question … is whether the reviewing court can conclude beyond reasonable doubt that a jury would have found true beyond a reasonable doubt *all* of the aggravating factors on which the trial court relied in exercising its discretion to select the upper term." (*Lopez*, at p. 467, fn. 11.) If the answer is no, the reviewing court must determine whether it is "certain, to the degree required by *People v. Watson* (1956) 46 Cal.2d 818, 836, that the trial court would

21.

nevertheless have exercised its discretion to select the upper term if it had recognized that it could permissibly rely on only a single one of the aggravating factors, a few of the aggravating factors, or none of the aggravating factors, rather than all of the factors on which it previously relied." (*Lopez*, at p. 467, fn. 11.) If the answer to both questions is no, the cause must be remanded for resentencing. (*Ibid*.)

In *People v. Dunn* (2022) 81 Cal.App.5th 394, 408 (*Dunn*), review granted October 12, 2022, S275655, this district adopted "a version of the standard articulated in *Lopez*, modified to incorporate *Watson* in the first step[.]" (*Dunn*, at p. 409.) The threshold determination, i.e., step "(1)(a)," is "whether the jury would have found one aggravating circumstance true beyond a reasonable doubt" *or* whether (i) the sentencing court relied on an aggravating circumstance proven by "the fact of defendant's prior convictions and a certified record of defendant's convictions was admitted, or [(ii)] defendant admitted the facts underlying an aggravating circumstance." (*Dunn*, at pp. 409–410 & fn. 13.)

If any of the step "(1)(a)" questions can be answered affirmatively, the reviewing court proceeds to step "(1)(b)," asking "whether there is a reasonable probability that the jury would not have found the remaining aggravating circumstance[s] [relied upon by the sentencing court] true beyond a reasonable doubt." (*Dunn*, *supra*, 81 Cal.App.5th at p. 410, rev. granted.) In essence, prejudice from the sentencing court's reliance on factors not found true by the jury is evaluated under the standard of *People v. Watson*, *supra*, 46 Cal.2d 818 (*Watson*) if the existence of at least one such factor can be determined with the degree of certainty required by *Chapman*. "If all aggravating circumstances relied upon by the trial court would have been proved to the respective standards, any error was harmless." If not, the reviewing court proceeds to the second part (step 2) of the analysis. (*Dunn*, at p. 410.)

In step 2, the reviewing court determines "whether there is a reasonable probability that the trial court would have imposed a sentence other than the upper term

22.

in light of the aggravating circumstances provable from the record as determined in the prior steps. If the answer is no, the error was harmless. If the answer is yes, the reviewing court vacates the sentence and remands for resentencing consistent with section 1170, subdivision (b)." (*Dunn*, *supra*, 81 Cal.App.5th at p. 410, rev. granted.)

The differing approaches of *Flores*, *Lopez*, and *Dunn* are currently under review by the California Supreme Court. (See *People v. Lynch* (May 27, 2022, C094174 [nonpub. opn.], rev. granted Aug. 10, 2022, S274942.) Incidentally, the author of *Flores* and another justice who concurred in the *Flores* opinion have since been persuaded by "the rationale for adding a state law harmless error component" to the analysis and now endorse "the two-step harmless error standard articulated in *Lopez*." (*People v. Ross* (2022) 86 Cal.App.5th 1346, 1354, rev. granted Mar. 15, 2023, S278266.) We will apply the *Dunn* analysis to defendant's claim, but it should be noted the outcome would be the same under *Lopez*. (See further discussion, *post*.)

### C. Analysis

#### 1. Step 1(a)

The trial court said it "believe[d] the probation report for the district attorney's office in this matter." Despite the ambiguity of this statement, all implied findings supporting the judgment "must be sustained on appeal if supported by substantial evidence." (*People v. Osband* (1996) 13 Cal.4th 622, 730.) However, to assume the existence of an unproven aggravating circumstance under the *Chapman* standard, the supporting evidence must essentially be "overwhelming and uncontested." (*People v. French*, *supra*, 43 Cal.4th at p. 53.) There is reasonable doubt as to the existence of the alleged circumstance if the record contains "'evidence that could rationally lead to a contrary finding.'" (*Ibid.*, quoting *Neder v. United States*, *supra*, 527 U.S. at p. 19.)

The trial court did not identify "an aggravating circumstance that relied only upon the fact of defendant's prior conviction[]," and, moreover, no certified records of the

alleged prior conviction were introduced or admitted into evidence. (*Dunn*, *supra*, 81 Cal.App.5th at p. 410, fn. 13, rev. granted.) Nor did defendant admit or stipulate to "the facts underlying an aggravating circumstance." (*Ibid.*) Defense counsel, in arguing for a mitigated term of seven years, alleged defendant's "only prior conviction [was for] a misdemeanor [violation of section] 273a(b) in which he was intoxicated and left a three year old child at the residence [unsupervised]." However, even assuming this constituted a binding admission regarding the fact of a prior conviction, the People's continued reliance on rule 4.421(b)(2) is misplaced.

Under rule 4.421(b)(2), an aggravating circumstance exists if the defendant's "prior convictions as an adult or sustained petitions in juvenile delinquency proceedings are numerous or of increasing seriousness." Disregarding the plain language of the rule, the People's statement in aggravation argued the "seriousness of [defendant's] *current convictions*," when contrasted with his "prior misdemeanor child abuse case," demonstrated a "significant increase in seriousness and severity as an adult." (Italics added.) There are two problems with the argument. First, "[t]he determinations whether a defendant has suffered prior convictions, and whether those convictions are 'numerous or of increasing seriousness' [citation], require consideration of only the number, dates, and offenses of the *prior convictions* alleged. The relative seriousness *of these alleged convictions* may be determined simply by reference to the range of punishment provided by statute for each offense." (*People v. Black* (2007) 41 Cal.4th 799, 819–820.) The nature and circumstances of the current convictions are irrelevant to the analysis.

The second problem with the People's argument is that defendant was alleged to have suffered only one prior conviction. The plain language of rule 4.421(b)(2), which uses the plural noun "convictions," requires multiple prior convictions (or juvenile adjudications) that are "numerous or of increasing seriousness." The numerosity provision has been construed as requiring a minimum of three prior convictions or adjudications. (See *People v. Black*, *supra*, 41 Cal.4th at p. 818 [citing *People v. Searle*

24.

(1989) 213 Cal.App.3d 1091, 1098, for proposition that "three prior convictions are numerous"]; *People v. Fernandez* (1990) 226 Cal.App.3d 669, 681 ["Two prior convictions … are not 'numerous'"].)  Findings of "increasing seriousness" have been upheld based on only two prior convictions or juvenile adjudications (e.g., *People v. Quiles* (2009) 177 Cal.App.4th 612, 621), but logic and reason dictate that a lone prior conviction is insufficient.  Therefore, the record does not support any implied findings of an aggravating circumstance under rule 4.421(b)(2).

The trial court expressly found defendant "violated the trust," presumably alluding to the factor stated in rule 4.421(a)(11):  "The defendant took advantage of a position of trust or confidence to commit the offense."  On this issue, the evidence at trial was overwhelming and uncontested.  Defendant had been in a relationship with the victim's mother for approximately 10 years and had known the victim since she was four years old.  They had resided together for roughly the same length of time, and, by all accounts, he was a father figure in her life.

The victim's mother testified to frequently leaving the victim alone with defendant, considering him to be "like a [stay-at-home] dad" during his periods of unemployment and/or medical leave from work.  Defendant testified to the closeness of his relationship with the victim:  "I was always in the position of advice.  I was advisor, teacher, instructor.  And if there became a problem then I would tell [her mother] about it and she was the one who would lay the law.  [¶] … [¶] … My role was just to advise her and give the best advice, you know, try to keep the yelling down, try to keep, you know, not go overboard with the punishment."  By defendant's own admission, the victim had confided in him about being sexually active with her boyfriend.  She testified to feeling "shocked" at the time of the offenses because, "I didn't think he was ever going to do this to me."

The evidence showed defendant had acquired and then violated a deep trust placed in him by the victim's mother and the victim herself.  It is apparent, beyond a reasonable

25.

doubt, that the jury would have found defendant "took advantage of a position of trust or confidence to commit the offense[s]." (Rule 4.421(a)(11).) We thus proceed to the next step of the analysis. (*Dunn*, *supra*, 81 Cal.App.5th at pp. 409–410, rev. granted.)

### 2. Step 1(b)

"We must next determine whether there is a reasonable probability that the jury would not have found the remaining aggravating circumstance[s] [relied upon by the trial court] true beyond a reasonable doubt." (*Dunn*, *supra*, 81 Cal.App.5th at p. 410, rev. granted.) In doing so, we are mindful "'"'that a "probability" in this context does not mean more likely than not, but merely a *reasonable chance*, more than an *abstract possibility*.'"'" (*People v. Wilkins* (2013) 56 Cal.4th 333, 351.) "Additionally, to the extent a potential aggravating circumstance … rests on a somewhat vague or subjective standard, it may be difficult for a reviewing court to conclude with confidence that, had the issue been submitted to the jury, the jury would have assessed the facts in the same manner as did the trial court." (*People v. Sandoval*, *supra*, 41 Cal.4th at p. 840.)

"Many of the aggravating circumstances described in the rules require an imprecise quantitative or comparative evaluation of the facts. For example, [rule 4.421(a)(3)] call[s] for a determination as to whether '[t]he victim was *particularly vulnerable*' …." (*People v. Sandoval*, *supra*, 41 Cal.4th at p. 840.) Here, the probation department and the prosecutor argued rule 4.421(a)(3) was applicable due to the victim's age and because "she was sleeping." The People appear to have abandoned the "sleeping" argument on appeal, perhaps realizing the significance of defendant's acquittal on count 2.

The jury's not guilty verdicts on counts 2, 7, and 8, and inability to reach a consensus on count 9, strongly suggest it did not believe all of the victim's testimony. Count 2 was based on the allegation she fell asleep during the magnet massage and awoke to defendant digitally penetrating her. Given its rejection of this charge, it is

26.

reasonably probable the jury concluded the victim was not sleeping. The People point to no additional evidence of vulnerability beyond the victim's age and the nature of her relationship with defendant. Without more, it is reasonably probable the jury would not have unanimously found the victim was "*particularly* vulnerable."[6] (Rule 4.421(a)(3); see *People v. Sandoval*, *supra*, 41 Cal.4th at p. 842 [listing "clear-cut" examples of victim vulnerability: "elderly, very young, or disabled, or otherwise obviously and indisputably vulnerable"].)

The probation department and the prosecutor further alleged, and the trial court appears to have relied upon, the applicability of rule 4.421(a)(8), i.e., "The manner in which the crime was carried out indicates planning, sophistication, or professionalism." The probation report argued defendant "isolated the victim and provided an excuse to touch her by offering a massage." The People's statement in aggravation argued, "After the incident, the Defendant tried to talk to the victim and tell her not to report it or tell her mom." The People also cited defendant's admission to showering after the incident and his alleged effort to persuade the victim to shower, the implied argument being it showed an effort to eliminate DNA evidence. At sentencing, the trial court found defendant "took care to plan this while the mother was not there."

While the record provides some support for the trial court's express and implied findings under rule 4.421(a)(8), it also contains evidence probative of the opposite conclusion. The incident did occur while the victim's mother was at work, but a six-year-old relative was present the entire time. This child fell asleep shortly before the crimes were committed and was napping in the victim's bedroom during the events. In addition, the mother was expected home soon and did in fact return not long after the

---

[6]We note defendant was already subject to increased punishment due to the victim's age. Forcible rape is ordinarily punishable "by imprisonment in the state prison for three, six, or eight years." (§ 264, subd. (a).) However, under section 264, subdivision (c)(2), the sentencing triad increases to seven, nine, or 11 years if the crime was committed "upon a minor who is 14 years of age or older."

incident had occurred. The victim testified to text messaging her mother from inside the bathroom about wanting to discuss something with her, and the mother replying that she "was on her way home."

Furthermore, what set everything in motion was the victim asking defendant to buy her a particular item. Defendant came up with a chore list in response to the request, and the victim elected to perform the "massage" at that point in time. Had the victim chosen to start with the other tasks on the list, e.g., vacuuming and washing dishes, her mother or one of the other adult relatives who lived there may have returned home by the time she was ready to use the magnets. It is reasonably probable at least one juror would have interpreted the evidence as demonstrating a complete *lack* of planning and sophistication, i.e., as showing defendant had acted impulsively in a moment of opportunity. (See, e.g., *People v. Wandrey* (2022) 80 Cal.App.5th 962, 983 ["While it may seem intuitively obvious that [appellant] abused a position of trust, this is less true as to whether [the victim] was *particularly* vulnerable and whether [the] offenses indicated planning. Some degree of speculation would necessarily be required for us to conclude the jury would have agreed with the trial court's evaluation"], rev. granted Sept. 28, 2022, S275942; *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1472 ["It is just as likely, if not more so, that the jury would have found [the crimes] were *not* planned, sophisticated, or professional"].)

We next consider the likelihood of the jury finding "[t]he crime involved great violence, great bodily harm, threat of great bodily harm, or other acts disclosing a high degree of cruelty, viciousness, or callousness." (Rule 4.421(a)(1).) The probation department cited rule 4.421(a)(1) without providing any factual argument or allegations. The People argued defendant "forcibly raped and attempted to sodomize, by use of force, his 14 year old stepdaughter," further noting the victim "sustained injury to the back of her cervix that was observed during her SART exam." The trial court made no express findings on this issue.

Forcible rape is a violent and inherently harmful offense. (See *People v. Rundle* (2008) 43 Cal.4th 76, 143 ["there is no doubt that a rape is a violent injury to another"].) "An aggravating circumstance is a fact that makes the offense 'distinctively worse than the ordinary.'" (*People v. Black*, *supra*, 41 Cal.4th at p. 817; see rule 4.420(h) ["A fact that is an element of the crime on which punishment is being imposed may not be used to impose a particular term"].) Determinations under rule 4.421(a)(1) involve the type of "somewhat vague" and subjective standards the California Supreme Court cautioned about in *Sandoval*. (*People v. Sandoval*, *supra*, 41 Cal.4th at p. 840.) The jury's mixed verdicts, combined with its questions about consent and the required lack thereof, make it difficult to surmise its conclusions regarding exactly what happened in this case, much less whether the facts demonstrated "*great* violence, great bodily harm, [the] threat of great bodily harm, or other acts disclosing a *high degree* of cruelty, viciousness, or callousness." (Rule 4.421(a)(1), italics added.)

The term "great bodily harm" is typically defined for jurors in the language of section 12022.7, i.e., to mean "a significant or substantial physical injury." (*Id.*, subd. (f); see, e.g., CALCRIM Nos. 821, 830.) As such, it is reasonably probable the jury would have focused on the victim's physical injuries (or lack thereof) as opposed to the psychological trauma she experienced. (See *People v. Caudillo* (1978) 21 Cal.3d 562, 582 [although "substantial *psychological* and *emotional* distress is experienced by rape victims generally," reference to "physical injury" in § 12022.7 does not include psychological or emotional distress].) Had the prosecutor's arguments to the jury regarding rule 4.421(a)(1) focused on the SART nurse's cervical findings—as argued in the statement of aggravation—it is reasonably probable not all 12 jurors would have been convinced beyond a reasonable doubt. As previously discussed, there was a plausible alternate explanation for those findings, i.e., consensual sex between the victim and her boyfriend. And while defendant's behavior was undeniably repugnant, we cannot be certain to the degree required by *Watson* that the jury would have unanimously found a

*high degree* of cruelty, viciousness, or callousness. (Cf. *People v. Garcia* (1989) 209 Cal.App.3d 790, 792, 794 [upper term sentencing justified under former rule 421(a)(1) where appellant, who "knew that he had herpes," raped a randomly targeted victim after having "punched and slapped her, dragged her by the hair across a parking lot …[,] beat her face, neck, and upper body, and … ripped off her clothing"].)

Another circumstance alleged by the prosecutor and probation department, but not expressly found by the trial court, was that defendant "has engaged in violent conduct that indicates a serious danger to society." (Rule 4.421(b)(1).) The People argued he "displayed predatory sexual behavior, used force and violence to complete the acts, and encouraged the victim not to report." The probation department gave no explanation for why rule 4.421(b)(1) was applicable, but a different section of its report claimed defendant had scored a "-1" on the "Static-99R," described therein as "the most widely used … [¶] actuarial measure of risk for sexual offense recidivism."

According to the probation report, defendant's Static-99R score "means his relative risk level is below average risk[,] which represents the risk of someone in this score group being charged or convicted of another sexual offense within five years after he is released on probation." More specifically, the risk of defendant reoffending was estimated to be "1.9%" over five years." The risk score was based on the information known at the time of sentencing.

Defendant's reportedly low score on the Static-99R and scant criminal history show the allegation he posed a "*serious danger* to society" was contestable. (Rule 4.421(b)(1), italics added.) "Aggravating circumstances are based upon facts that are not elements of the crime[,] … [and] [d]efendant thus did not necessarily have reason—or the opportunity—during trial" to dispute the applicability of rule 4.421(b)(1). (*People v. Sandoval*, *supra*, 41 Cal.4th at p. 839.) Therefore, we "cannot necessarily assume that the record reflects all of the evidence that would have been presented had [the issue] been

30.

submitted to the jury." (*Ibid.*) But even as the record stands now, it is possible the jury would not have found this aggravating circumstance true beyond a reasonable doubt.

We lastly observe that the prosecutor, while alleging various aggravating circumstances, argued defendant had "shown absolutely no remorse." The trial court subsequently made a remark about "never hear[ing] once that [defendant] was sorry" and further noted he had "denied everything." These and other related statements arguably suggest the trial court considered defendant's lack of remorse and/or refusal to admit guilt to be an additional aggravating factor.

A criminal defendant has the right to maintain his or her innocence. (*People v. Bloom* (2022) 12 Cal.5th 1008, 1038–1039.) A sentencing court may consider as a *mitigating* circumstance whether the defendant "voluntarily acknowledged wrongdoing before arrest or at an early stage of the criminal process." (Rule 4.423(b)(8).) However, a defendant's refusal to admit guilt does not, in and of itself, constitute an aggravating circumstance justifying the imposition of upper term sentencing.

In death penalty cases, "lack of remorse, because it suggests the absence of a mitigating factor, is deemed a relevant factor in the jury's determination as to whether the factors in aggravation outweigh those in mitigation, and is thus an appropriate subject of comment by the prosecutor, so long as he or she does not argue that lack of remorse constitutes a factor in aggravation." (*People v. Crittenden* (1994) 9 Cal.4th 83, 150; accord, *People v. Duong* (2020) 10 Cal.5th 36, 71.) In noncapital cases, remorse is a factor to be considered in deciding whether to grant probation. (Rule 4.414(b)(7).) Defendant, however, was statutorily ineligible for probation. (§ 1203.065, subd. (a).)

Lack of remorse is not among the aggravating factors listed in rule 4.421. It may sometimes be considered under the catchall provisions of rules 4.408(a) and 4.421(c), but not if "'the defendant has denied guilt and the evidence of guilt is conflicting.'" (*People v. Leung* (1992) 5 Cal.App.4th 482, 507, italics omitted; accord, *People v. Weber* (2013) 217 Cal.App.4th 1041, 1064, fn. 7.) Defendant denied guilt, and the evidence at trial was

conflicting. Therefore, his alleged lack of remorse could not be relied upon as an aggravating circumstance.[7]

### 3. *Step 2*

We must now determine "whether there is a reasonable probability that the trial court would have imposed a sentence other than the upper term in light of the aggravating circumstances provable from the record as determined in the prior steps." (*Dunn*, *supra*, 81 Cal.App.5th at p. 410, rev. granted.) As explained above, only one of the alleged circumstances "would have been proved to the respective standards." (*Ibid*.) The question, therefore, is whether the trial court would have concluded upper term sentencing was appropriate and justified solely because "defendant took advantage of a position of trust or confidence to commit the offense" (rule 4.421(a)(11)). (See § 1170, subd. (b).)

In *People v. Avalos* (1984) 37 Cal.3d 216, the California Supreme Court applied the *Watson* standard "to determine whether error by the trial court in relying upon improper factors in aggravation requires remanding for resentencing." (*Avalos*, at p. 233.) The case holds remand is necessary if the reviewing court "cannot determine

---

[7]Additionally, in light of Senate Bill 567, a defendant's lack of remorse would now need to be found true by the trier of fact before the sentencing court could rely upon it under the catchall provisions. While on the witness stand, defendant was asked about his displays of emotion during the testimony of the victim and the victim's mother. He testified: "It's because I miss them. [¶] … [¶] Both of them. I was out—I was always there for them and, you know, I tried to do my best and I loved them. I still do. That's why." The jury also saw defendant cry in the video of his custodial interview, wherein he discussed his efforts to be a good parent and how much he valued his family. Although maintaining innocence and lacking remorse can go hand in hand, both are not mutually exclusive. (See *People v. Fierro* (1991) 1 Cal.4th 173, 244 ["there appears to be little practical difference between a failure to confess and a claim of innocence; neither should be cited as evidence of lack of remorse"].) The current law provides for bifurcation of the trial on the circumstances in aggravation from trial of the charges and enhancement allegations (§ 1170, subd. (b)(2)), so a defendant's exercise of their right to contest the charges is hardly indicative of how the issue of remorse would be argued to jurors following a guilty verdict. Thus, even assuming defendant's alleged lack of remorse could be considered as an aggravating factor, the record does not necessarily demonstrate harmless error in failing to submit the issue to the jury.

whether the improper factor was determinative for the sentencing court." (*Ibid.*) Here, the trial court directly and indirectly referenced multiple aggravating circumstances without indicating the relative importance of any to its decision. As we cannot deduce whether the improperly considered factors were determinative, it is necessary to remand for resentencing.

## IV. Mooted Claims

Defendant's briefing alleges additional sentencing errors. All such claims, including one based on the imposition of certain fines and fees and the holding of *People v. Dueñas* (2019) 30 Cal.App.5th 1157, are mooted by defendant's entitlement to a new sentencing hearing. Those mooted issues may be raised on remand.

## DISPOSITION

Defendant's sentence is vacated and the cause is remanded for resentencing consistent with section 1170, subdivision (b). In all other respects, the judgment is affirmed.

PEÑA, Acting P. J.

WE CONCUR:


SMITH, J.


DE SANTOS, J.

33.